NO. 26-2028

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

UNITED STATES OF AMERICA,
Appellant

v.

GRISELLE LaCOSTA-FRANCO,
Appellee

APPEAL FROM ORDER SUPPRESSING EVIDENCE
IN CRIMINAL NO. 26-027 IN THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BRIEF FOR APPELLANT UNITED STATES OF AMERICA

DAVID METCALF
United States Attorney

ROBERT A. ZAUZMER
Assistant United States Attorney
Chief of Appeals

ASHLEY N. MARTIN
NICHOLAS A. DiMARCO
Assistant United States Attorneys

615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
(215) 861-8388

**TABLE OF CONTENTS**

JURISDICTIONAL STATEMENT.................................................................1

    I.    Subject Matter Jurisdiction..........................................1

    II.    Appellate Jurisdiction ................................................1

STATEMENT OF ISSUE ........................................................ 2

INTRODUCTION ................................................................... 3

STATEMENT OF THE CASE ................................................ 4

    I.    Procedural History ..................................................... 4

    II.    Statement of Facts...................................................... 4

        A.    Law Enforcement Arrest LaCosta-Franco in a Stolen Vehicle with Narcotics and Two Cell Phones on Her Person ..................................... 4

        B.    The Search Warrant.......................................... 8

        C.    The District Court's Ruling............................12

            1.    The district court found the warrant application lacked probable cause .........................12

            2.    The district court found the good faith exception did not apply ...........................................16

STATEMENT OF RELATED CASES.........................................18

SUMMARY OF ARGUMENT .................................................................19

ARGUMENT ................................................................................ 23

THE DISTRICT COURT ERRED IN GRANTING
THE MOTION TO SUPPRESS THE FRUITS OF
THE SEARCH WARRANT FOR LaCOSTA-FRANCO'S
TWO CELL PHONES ................................................................. 23

    A.    The Affidavit Presented Probable Cause ........................ 24

        1.    The facts presented in the warrant
established probable cause that material
evidence would be found in the cell phones .......... 26

        2.    The affidavit properly supported a finding
of probable cause that evidence would be
found in the phones; proof that the phones
were specifically used to commit the charged
crimes is not required ........................................... 37

        3.    There is no special protection for cell
phones .................................................................. 40

    B.    The Good Faith Exception Applies ................................. 54

CONCLUSION ........................................................................... 61

# TABLE OF AUTHORITIES

## Cases

*Aguilar v. Texas,*
    378 U.S. 108 (1964)..................................................................... 59

*Carpenter v. United States,*
    585 U.S. 296 (2018) .............................................................passim

*Clark v. United States,*
    2020 WL 4668918 (11th Cir. 2020) ................................................ 52

*District of Columbia v. Wesby,*
    583 U.S. 48 (2018)...............................................................24, 31

*Florida v. Jardines,*
    569 U.S. 1 (2013).......................................................................41

*Herring v. United States,*
    555 U.S. 135 (2009) ................................................................... 54

*Hudson v. Michigan,*
    547 U.S. 586 (2006).................................................................... 54

*Illinois v. Gates,*
    462 U.S. 213 (1983)..............................................................passim

*In re Search of One Device & Two Individuals Under Rule 41,*
    783 F. Supp. 3d 183 (D.D.C. 2025)............................................ 43, 47

*Johnson v. United States,*
    333 U.S. 10 (1948)...................................................................... 33

*Kendig v. Stolar,*
    173 F.4th 466 (3d Cir. 2026).......................................................... 36

*Malley v. Briggs,*
    475 U.S. 335 (1986).................................................................... 56

*Massachusetts v. Upton,*
466 U.S. 727 (1984).................................................................. 25

*Messerschmidt v. Millender,*
565 U.S. 535 (2012)...........................................................55, 57

*Nathanson v. United States,*
290 U.S. 41 (1933)................................................................... 59

*Riley v. California,*
573 U.S. 373 (2014)..........................................................passim

*Silverman v. United States,*
365 U.S. 505 (1961).................................................................41

*Spinelli v. United States,*
393 U.S. 410 (1969)................................................................. 25

*United States v. Adams,*
971 F.3d 22 (1st Cir. 2020) ..................................................... 52

*United States v. Arvizu,*
534 U.S. 266 (2002)...........................................................24, 31

*United States v. Batista,*
2024 WL 5053262 (10th Cir. 2024) ........................................ 27

*United States v. Brewer,*
708 F. App'x 96 (3d Cir. 2017)................................................ 46

*United States v. Burton,*
288 F.3d 91 (3d Cir. 2002) ............................... 19, 26, 30, 38

*United States v. Carey,*
2020 WL 59607, (M.D. Pa. 2020).......................................13

*United States v. Carothers,*
2024 WL 4452053 (W.D. Pa. 2024)...................................14

*United States v. Conley,*
    4 F.3d 1200 (3d Cir. 1993) ............................................................ 23

*United States v. Cook,*
    2021 WL 1534980 (M.D. Pa. 2021) ..................................................13

*United States v. Davis,*
    94 F.4th 310 (4th Cir. 2024) ........................................................... 28

*United States v. Eggerson,*
    999 F.3d 1121 (8th Cir. 2021)....................................................28, 51

*United States v. Gorny,*
    2014 WL 2860637 (W.D. Pa. 2014)..............................................15, 27

*United States v. Griffith,*
    598 F. Supp. 3d 221 (M.D. Pa. 2022)
    *aff'd*, 2024 WL 5053426 (3d Cir. 2024)........................................... 27

*United States v. Hodge,*
    246 F.3d 301 (3d Cir. 2001)............................................23, 26, 33, 40

*United States v. Ivey,*
    91 F.4th 915 (8th Cir. 2024) ........................................................... 50

*United States v. Jones,*
    994 F.2d 1051 (3d Cir. 1993)......................................................31, 44

*United States v. Katzin,*
    769 F.3d 163 (3d Cir. 2014) .......................................................55, 57

*United States v. Leake,*
    998 F.2d 1359 (6th Cir. 1993)......................................................... 59

*United States v. Leon,*
    468 U.S. 897 (1984) ....................................................... 16, 54, 56, 57

*United States v. Lindsey,*
    4 F.4th 32 (1st Cir. 2021) ................................................................51

*United States v. Merriweather,*
728 F. App'x 498 (6th Cir. 2018) ...................................................... 46

*United States v. Mortimer,*
387 F. App'x 138 (3d Cir. 2005) ...................................................... 59

*United States v. Morton,*
46 F.4th 331 (5th Cir. 2022) ..................................................... 29, 60

*United States v. Opoku,*
556 F. Supp. 3d 633 (S.D. Tex. 2021) ............................................. 47

*United States v. Orozco,*
41 F.4th 403 (4th Cir. 2022) ...................................................... 28, 51

*United States v. Perez,*
712 F. App'x 136 (3d Cir. 2017) ........................................................ 12

*United States v. Ramirez,*
180 F. Supp. 3d 491 (W.D. Ky. 2016) .............................................. 47

*United States v. Ritter,*
416 F.3d 256 (3d Cir. 2005) .............................................................. 25

*United States v. Sheckles,*
996 F.3d 330 (6th Cir. 2021) ........................................................... 46

*United States v. Silva,*
146 F.4th (2d Cir. 2025) ............................................................. 48, 50

*United States v. Stearn,*
597 F.3d 540 (3d Cir. 2010) ...................................................... passim

*United States v. Tanzil,*
2025 WL 3244494 (6th Cir. 2025) ................................................... 47

*United States v. Tutis,*
845 F. App'x 122 (3d Cir. 2021) .................................................. 13, 32

*United States v. Ventresca,*
    380 U.S. 102 (1965) ............................................................ 24, 25, 58

*United States v. Whitner,*
    219 F.3d 289 (3d Cir. 2002) ......................................................passim

*United States v. Williams,*
    974 F.3d 320 (3d Cir. 2020) ................................................. 19, 23, 30

*United States v. Zimmerman,*
    277 F.3d 426 (3d Cir. 2002) ............................................................16

## Statutes and Rules

18 U.S.C. § 3231 ....................................................................................1

18 U.S.C. § 3731 ....................................................................................1

21 U.S.C. § 841(a) ........................................................................4, 12, 44

21 U.S.C. § 846.................................................................................... 44

# JURISDICTIONAL STATEMENT

## I. Subject Matter Jurisdiction

The district court had subject matter jurisdiction over this criminal case pursuant to 18 U.S.C. § 3231.

## II. Appellate Jurisdiction

Based upon the timely filing of a notice of appeal from the order of the district court suppressing evidence, entered on April 2, 2026, this Court has jurisdiction over this matter under 18 U.S.C. § 3731.

## STATEMENT OF ISSUE

Did the district court err in granting the defendant's motion to suppress evidence?

<u>Preservation of issue</u>: The government preserved its objection by opposing the defendant's motion in writing and at a suppression hearing.

# INTRODUCTION

Police arrested Griselle LaCosta-Franco in a stolen truck, wearing latex gloves and sitting on top of 1.5 kilograms of heroin. Police lawfully searched LaCosta-Franco incident to arrest and recovered from her person a smorgasbord of narcotics (fentanyl, heroin, and crack cocaine), and the two cell phones at issue in this appeal. Elsewhere in the stolen truck, police recovered more drugs and paraphernalia. LaCosta-Franco faces criminal charges as a result. But the district court, in a ruling on April 2, 2026, granted LaCosta-Franco's motion to suppress the fruit of the search warrant for LaCosta-Franco's two cell phones that produced further evidence of her intent to distribute narcotics.

The court held that the warrant lacked probable cause, and that the Drug Enforcement Administration ("DEA") affiant did not act in good faith. This ruling is inconsistent with basic principles of judicial review of warranted searches as well as applicable precedent authorizing law enforcement to search the phones of drug dealers. The government therefore appeals.

## STATEMENT OF THE CASE

## I. Procedural History

On January 15, 2026, defendant/appellee Griselle LaCosta-Franco was charged in an indictment with one count of possession with intent to distribute 1,000 grams or more of heroin in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A), and one count of possession with intent to distribute fentanyl, heroin, and crack cocaine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C). She was held in pretrial custody.

On February 27, 2026, LaCosta-Franco filed a motion to suppress evidence obtained from two cell phones seized from her person at the time of her arrest. The government opposed the motion. The court held oral argument on March 11, 2026. App. 69-130. On April 2, 2026, the court issued an order and opinion granting the motion and suppressing all fruits of the search warrant. App. 4-36. The government filed a timely appeal.

## II. Statement of Facts

### A. Law Enforcement Arrest LaCosta-Franco in a Stolen Vehicle with Narcotics and Two Cell Phones on Her Person.

On September 22, 2025, at approximately 10:33 a.m., a license plate reader on a Philadelphia Police Department ("PPD") patrol vehicle passed a 2021 silver Dodge Ram truck with Pennsylvania license plate #ZXH-3735.

The truck was parallel parked on the street in front of 3444 Shelmire Avenue in Philadelphia. The license plate reader alerted law enforcement that the truck was in stolen status. PPD plainclothes officers Sean Kennelly and Stephen Burgoon responded to the area and set up surveillance in an unmarked car around the corner but in view of the truck. App. 53.

A short time later, the officers observed LaCosta-Franco walk up to the Dodge Ram and place an object in the rear passenger's seat of the truck. Officers Kennelly and Burgoon observed LaCosta-Franco get into the front driver's seat of the Dodge Ram and turn the truck on. The officers then called for uniformed patrol officers in the area to respond. App. 54.

At approximately 11:30 a.m., uniformed police officers arrived in the area and approached the Dodge Ram, where LaCosta-Franco remained in the front driver's seat. As officers approached, they observed LaCosta-Franco exit the truck, wearing blue latex gloves on her hands and a cross-body bag across her chest. LaCosta-Franco resisted police commands and attempts to detain her. After officers placed her in the back of a PPD patrol vehicle, she attempted to slip out of her handcuffs and conceal items in her pockets. When officers attempted to remove her from the vehicle to search her, she gave significant resistance. App. 54.

Officers ultimately recovered from LaCosta-Franco's person substantial evidence of drug trafficking, including "approximately fifty blue glassine baggies containing fentanyl, a vial containing heroin, approximately ten suboxone strips, multiple prescription pills, [and] a container of 'crack' cocaine." App. 54. Notably, the officers also recovered two cell phones from LaCosta-Franco's person: a navy-blue iPhone and another iPhone in a black case. The search warrant affidavit states: "LACOSTA-FRANCO repeatedly slipped her handcuffs—meaning she repeatedly moved them down her wrists and off of her hands—and attempted to conceal items in her pockets, including SUBJECT DEVICE-1 and SUBJECT DEVICE-2 [i.e., the cell phones]." App. 54.[1]

The police then conducted an inventory search of the Dodge Ram and recovered further evidence of drug trafficking. On the driver's seat—where LaCosta-Franco was seated at the time officers approached the Dodge Ram—officers located two clear, heat-sealed bags containing approximately one and a half kilograms of heroin. Moreover, officers located a navy blue backpack in the rear passenger seat of the Dodge Ram. The backpack

---

[1] Officers also recovered 8.737 grams of bulk fentanyl from LaCosta-Franco's person, but this fact was omitted from the affidavit at issue in this appeal.

contained multiple black plastic bags. App. 55. Inside of the various bags in

the backpack, officers recovered the following:

- Blue latex gloves consistent with the gloves LaCosta-Franco was wearing at the time of her arrest

- A box of blue glassine packets consistent with the packaging of the drugs recovered from LaCosta-Franco

- Three digital scales

- 17.2 grams of cocaine

- 49.9 grams of O6-Monocetylmorphine

- 52.5 grams of fentanyl (bulk)

- 10.189 grams of fentanyl

- AnaSed

- "SOS" stamped glassine baggies

- Rubber bands

- A pill bottle with the name Rosa Rivera listed as a patient

- A Pennsylvania driver's license belonging to an individual named Miguel Roman Jr.

App. 55-56.

Law enforcement also investigated the stolen Dodge Ram. The owner

of the Dodge Ram stated to law enforcement that two individuals took his

vehicle without permission. App. 56. The owner denied ownership of the

narcotics and told law enforcement that LaCosta-Franco did not have permission to use his truck. App. 56.

## B.    The Search Warrant.

After discussions between the parties regarding possible resolution of criminal charges proved unfruitful, the government obtained an indictment as described above. The government also applied for a federal search warrant for the two seized cell phones from United States Magistrate Judge Carol Sandra Moore Wells. The judge approved and issued the warrant on February 4, 2026, authorizing the government to search the two cell phones for evidence produced during a limited time period (the month leading to LaCosta-Franco's arrest) and for specific information related to the charged narcotics offenses and potential conspiracy charges. App. 49-68.

In support of the application for a search warrant, DEA Special Agent Ryan Scanlan submitted a 15-page, 42-paragraph affidavit of probable cause. The affidavit outlined Agent Scanlan's work history, including investigations involving narcotics traffickers, and training and experience regarding electronic items including cell phones. App. 50-51. The affidavit further summarized Agent Scanlan's observations based on his training and experience investigating drug traffickers, including that:

- "narcotics traffickers frequently use cellular telephones, and other communication devices to further their illegal activities by

- remaining in constant or ready communication with one another without restricting either party to a particular telephone or location" in order to "evade surveillance"

- "narcotics traffickers frequently transmit pre-arranged numerical codes to text messaging services on cellular phones to identify themselves or to otherwise communicate information, such as price or quantity of drugs, to the person in possession of the cell phone"

- "those involved in illegal drug operations often subscribe their telephones and cellular telephones in the names of others or purchase pre-paid cellular telephones that require the purchaser to provide little or no identifying information to utilize the phone"

- "drug traffickers often use multiple cellular telephones to conduct illegal narcotics activity" and frequently change their telephone numbers in order "to thwart electronic surveillance and conceal their criminal activities"

App. 51-52.

In the affidavit, Agent Scanlan then detailed the specific facts related to the arrest of LaCosta-Franco that established probable cause to search the cell phones. Specifically, the affidavit summarized LaCosta-Franco's arrest, consistent with the details presented above, and explained that officers recovered from LaCosta-Franco's person two cell phones that she tried to conceal, and also recovered the contraband on her person and in the vehicle described above.

Agent Scanlan described what types of information he expected to find in a search of the seized cell phones. Specifically, he averred that he

knew, based on his training and experience, that drug traffickers frequently communicate with associates through telephone calls (and voice mail messages), e-mail and text messages, and social media networking sites. App. 56-57. He stated that analysis of these communications may enable law enforcement to identify co-conspirators and associated telephone numbers, as well as to determine if there were communications between associates during the commission of LaCosta-Franco's crimes. App. 56-57. Indeed, Agent Scanlan's affidavit denotes that there was evidence of co-conspirators in the truck—specifically, the driver's license for Miguel Roman Jr., found in one of the bags inside the backpack that contained drugs and drug paraphernalia, and the pill bottle with the name Rosa Rivera listed as a patient. App. 55.

Agent Scanlan further explained that cell phones contain address books that drug traffickers frequently use to list drug associates (often by nickname to avoid detection) that could be used to verify numbers being used by drug traffickers. Moreover, Scanlan averred that drug traffickers often take photographs or videos of themselves and their co-conspirators, or of drugs and drug proceeds, and retain them on cell phones. App. 57. Agent Scanlan further averred that his experience and training has taught him that drug traffickers often use a cell phone's Internet browser to

conduct drug trafficking activities, such as to search the Internet for banks or mail delivery services, to make travel arrangements, or to post or communicate with co-conspirators on social networking sites. App. 57-58. Scanlan further averred that cell phones can be used by drug traffickers as navigation devices, such as through GPS navigation capabilities that store information that could identify where the cell phones were located. Lastly, Agent Scanlan averred that forensic evidence recovered from the review of cell phones can also assist in "establishing the identity of the user of the device, how it was used, the purpose of its use, and when it was used." App. 58. The affidavit also outlined Scanlan's training and experience searching electronic data. App. 58-63.

Based on the foregoing averments, Agent Scanlan submitted that probable cause existed to search the two cell phones, identified with particularity in Attachments A-1 and A-2 to the affidavit. App. 65-66. Attachment B to the affidavit specified the property to be seized from the search of the two cell phones. App. 67-68. The seizure was time-restricted to the time period between August 22, 2025, and September 22, 2025—that is, the month leading to LaCosta-Franco's arrest. App. 67. Attachment B further delimited the scope of seizable records to those "that relate to

violations of Title 21 United States Code, Sections 841(a)(1), and 846."

App. 67.

On February 4, 2026, upon review of the search warrant application

and affidavit in support, Magistrate Judge Carol Sandra Moore Wells issued

the warrant.

**C.    The District Court's Ruling.**

The district court held that the warrant application did not set forth

probable cause, and further that the good faith exception did not apply to

bar application of the exclusionary rule.

**1.    The district court found the warrant application lacked probable cause.**

First, the court found the warrant lacked probable cause to search the

contents of the cell phones.[2] The court began its analysis by stating that,

following the Supreme Court's decision in *Riley v. California*, 573 U.S. 373,

386 (2014), "courts have struggled to adapt Fourth Amendment search

doctrines developed for physical spaces to digital contexts." App. 18 (citing

*United States v. Perez*, 712 F. App'x 136, 139 (3d Cir. 2017) (not

precedential)). However, in the court's view, the "trend of persuasive

---

[2] As an initial matter, the district court rejected LaCosta-Franco's principal argument that the delay between the seizure of the cell phones and the search warrant was unreasonable, rendering the seizure unconstitutional. App. 14-17.

authority counsels that an affidavit of probable cause must include objective, offense-specific facts—be they direct or indirect—connecting the crimes charged with the specific use of the cellphone and its contents." App. 19.

The district court proceeded to distinguish the cases cited by the government, acknowledging that the government provided "some authority containing fact patterns tending to support the position that the affidavit here is enough to establish probable cause." App. 21. To begin, the court distinguished this Circuit's decision in *United States v. Tutis*, 845 F. App'x 122 (3d Cir. 2021) (not precedential), which the government cited for the well-established proposition that LaCosta-Franco's possession of multiple cell phones is evidence of drug trafficking activity. The court acknowledged that the *Tutis* panel affirmed a probable cause finding based, in part, on the fact that the defendant in that case had multiple cell phones, but reasoned that *Tutis* does not support the position that evidence of multiple cell phones alone can form the basis for probable cause. App. 20.

Next, the district court dismissed the government's reliance on *United States v. Cook*, 2021 WL 1534980 (M.D. Pa. 2021), and *United States v. Carey*, 2020 WL 59607, (M.D. Pa. 2020), finding the analysis in those cases "somewhat limited." App. 22. The court further distinguished

*United States v. Carothers*, 2024 WL 4452053 (W.D. Pa. 2024), also cited by the government, on the grounds that "*Carothers* contemplated co-defendants and the indictments included a conspiracy charge." App. 22. The court also found *Carothers* "troubling," in that the affiant there stated, based on his training and experience, that he was "aware that [drug traffickers], like law-abiding citizens, will take photographs and videos using their cellular telephones of themselves with their friends, relatives, and associates and keep them on their cellular telephones." In the district court's view, "*Carothers* highlights this Court's principal alarm with warrants based solely on 'training and experience.'" App. 23. These so-called "'training and experience' or 'trust me' warrants divine a defendant's alleged cellphone use" based on "nothing different than the way any free citizen uses a cellphone." App. 23.

To illustrate this point, the court engaged in a "semantic exercise" to demonstrate that certain averments in Agent Scanlan's affidavit regarding how drug traffickers use cell phones read the same if the term "drug traffickers" is replaced with a reference to innocent persons, like "judges." App. 23-24. The court concluded that "[n]one of the paragraphs detailing the affiant's training and experience describe cellphone use unique to drug traffickers." App. 25. Rather, the district court concluded, "when it comes to

establishing probable cause to sort through another's privacy, something more in the way of case-specific evidence must nudge training and experience across the finish line." App. 25.

Fundamentally, the district court reasoned that "[t]he ubiquity and technology of smartphones occupy a unique space in the present-day[,] and the Supreme Court has at least suggested in *Riley* and *Carpenter* that Courts should think about them differently." App. 26 (citing *Riley* and *Carpenter v. United States*, 585 U.S. 296 (2018)). The court then summarized *United States v. Gorny*, 2014 WL 2860637, at *4 (W.D. Pa. 2014), which involved a search warrant for the contents of two cell phones recovered from the defendant during an arrest for firearms offenses. App. 27-28. The magistrate in *Gorny* considered the officers' training and experience combined with the knowledge from undercover operations that the defendant had actually engaged in sales via his cell phone—according to the district court, "[t]he latter portion is missing here." App. 27.

Nevertheless, the district court clarified that Agent Scanlan did not need to conduct an undercover buy through LaCosta-Franco's cell phone to establish probable cause. App. 28. "But *something* in the way of objective information related to the Defendant's phones is needed to buttress the officer's training and experience." App. 28-29 (emphasis in original) (citing

*United States v. Zimmerman*, 277 F.3d 426, 434 (3d Cir. 2002)); *see also* App. 29 (finding the "better analysis emerges from cases pointing to objective, crime-specific information related to the place to be searched"). Otherwise, the district court believed that the government could "justify the search of any phone for any crime imaginable" by invoking the "magic words 'training and experience'...." App. 29.

### 2. The district court found the good faith exception did not apply.

Second, the district court found the good faith exception did not bar application of the exclusionary rule, concluding the warrant was "devoid of any objective basis for a finding of probable cause." App. 31-32. The court found that because "a reasonable officer could not believe that any time a defendant is arrested with a cellphone the contents of that phone would be subject to search," the "warrant could not have been executed in good faith." App. 32; *see also* App. 33 ("In this Court's view, a 'reasonably well-trained officer' familiar with the bounds of the Fourth Amendment would know that their training and experience must be linked with some crime-specific facts regarding the place to be searched."). Most of the district court's analysis is based on *United States v. Leon*, 468 U.S. 897, 922 (1984), which the Court found "factually distinguishable." App. 33. The court reasoned that, unlike in *Leon*, Agent Scanlan's reliance on Magistrate

Judge Wells' probable cause determination was not "objectively reasonable" in the absence of evidence "connecting the Defendant's phone to a crime...." App. 34.

Finally, the court conducted a cost-benefit analysis, weighing "the deterrence benefits of exclusion" against the "substantial social costs" of excluding the evidence. App. 34. On the one hand, the court believed it "worth deterring" "[t]he use of boilerplate, stock warrant applications." App. 35. Conversely, the district court concluded that the social cost was "low," because, in the court's view, "[t]here is copious and damning evidence against the Defendant in this matter—even without the contents of the cellphone." App. 35.[3]

---

[3] The government demurs regarding the utility of the cell phone evidence, and accordingly presents this appeal. In this case, the anticipated defense is that the defendant was only a bystander who was for some reason entrusted with the vehicle. Evidence of her involvement in and association with drug trafficking is useful to defeat that defense. At present, the government has obtained limited partial extractions from LaCosta-Franco's cell phones, which revealed iCloud account information for each cell phone. On February 13, 2026, the government applied for and obtained a search warrant for the iCloud accounts associated with the two cell phones. The government obtained through that warrant contact information for each phone—specifically, the number of contacts contained in each iCloud (1,237 named contacts on one phone versus less than 10 unnamed contacts on the other) and drug trafficking monikers used after a number of the contacts, like "weed," "ice," "loko," "china," "her," and "chef."

## STATEMENT OF RELATED CASES

The government is not aware of any other related case or proceeding that is completed, pending, or about to be presented before this Court or any other court or agency, state or federal.

## SUMMARY OF ARGUMENT

The district court committed fundamental errors in its ruling that require correction by this Court on basic and significant issues of constitutional law and the well-established authority of law enforcement to obtain search warrants for cell phones. Foremost, the court erred in finding no probable cause to search the cell phones in this case.

For starters, this Court's many rulings in *Williams*, *Stearn*, *Burton*, *Whitner*, and *Hodge* establish that there is probable cause to search the premises of drug dealers even absent direct evidence that such premises were used for drug dealing. Those decisions control the outcome of this case. Federal courts that have addressed this principle have held as much in the context of cell phones. But, even if this were a novel question, the relevant facts here easily meet the low standard of "probable cause" and, with the "great deference" owed to a federal magistrate judge's initial determination, command the same result.

As documented in the search warrant affidavit, there were obvious and abundant facts suggesting at least a probability that the owner of these phones, LaCosta-Franco, was a drug dealer trafficking substantial drugs at the very moment the phones were found on her person. She possessed on her person (and tried to conceal) two cell phones, along with multiple types

of controlled substances. She had literally been sitting on packages containing one and a half kilograms of heroin, and there was extensive additional contraband nearby in the stolen vehicle. Tying it all together, a veteran DEA agent set forth his particular training and experience presenting knowledge that cell phones of drug dealers generally, and specifically in this case, will contain evidence of a crime.

For as long as cell phones have existed, courts have found probable cause based on similar facts. It was indeed probable that LaCosta-Franco used her cell phones in connection with the drug trafficking activities in which she was so clearly engaged, to acquire the large stash of drugs she possessed and to plan to distribute them. The reasonable inference, and frankly common sense, was that the evidence of drug trafficking that police actually obtained from LaCosta-Franco's person, bags, and vehicle, would also be found on her phones.

In ruling otherwise, the court disregarded all of these relevant facts, and failed to engage in the appropriate probable cause inquiry of looking at the totality of circumstances, making common-sense conclusions, and deferring to the magistrate judge's assessment. Instead, it declared a specific and unprecedented rule applicable only to search of cell phones, that there must be "offense-specific facts—be they direct or indirect—

connecting the crimes charged with the specific use of the cellphone and its contents." App. 19.

This novel and inappropriate rule of Fourth Amendment jurisprudence is not supported by the Supreme Court's decisions in *Riley* and *Carpenter* on which the court relied and confuses the issue of whether an object or place was used in a crime with the correct standard of whether there is probable cause that evidence regarding the crime will be found in the targeted location. This is the rule under which courts have consistently concluded that cell phones of drug dealers, like their residences, contain evidence of their crimes and a search thereof is warranted.

The Court should reverse on this basis. But even if this Court somehow agreed with the district court's ruling on probable cause, the secondary basis for reversal is the district court's denial of application of the good faith exception to the exclusionary rule. As argued above, the district court's decision is unprecedented, at the same time that many cases support the agent's position in this case linking the use of cell phones to large-scale drug trafficking. We are not aware of a single decision anywhere that matches the district court's conclusion: that where a person is found in possession of a large quantity of narcotics, with packaging material and other accoutrements of drug trafficking, along with two cell phones, that

there is not at least a probability that evidence related to the acquisition and intended distribution of the narcotics will be found on the phone, and that instead the affiant must present evidence linking the actual use of the phone to criminal activity. In this circumstance, it cannot conceivably be said that the agent, who presented a professional and comprehensive affidavit, did not act in good faith in relying on the magistrate judge's approval.

# ARGUMENT

## THE DISTRICT COURT ERRED IN GRANTING THE MOTION TO SUPPRESS THE FRUITS OF THE SEARCH WARRANT FOR LaCOSTA-FRANCO'S TWO CELL PHONES

### Standard of Review

As explained in more detail below, this Court exercises plenary review of the district court's evaluation of the magistrate's probable cause determination, *United States v. Conley*, 4 F.3d 1200, 1205 (3d Cir. 1993). This Court pays "great deference" to the initial probable cause determination made by the magistrate, *Illinois v. Gates*, 462 U.S. 213, 236 (1983), "asking only whether the magistrate had a substantial basis for concluding that probable cause existed," *United States v. Williams*, 974 F.3d 320, 350 (3d Cir. 2020) (quoting *id.* at 238-39).

This Court likewise exercises plenary review of the district court's finding that the good faith exception did not apply in this case. *United States v. Hodge*, 246 F.3d 301, 307 (3d Cir. 2001).

### Discussion

The district court erred in granting the motion to suppress filed by defendant Griselle LaCosta-Franco. Contrary to its ruling, the affidavit at issue was supported by probable cause, and in any event, the good faith rule should preclude suppression of the evidence. The court's error was

grounded in a misstatement of applicable Fourth Amendment law, and an apparent incorrect belief that the authority to search on the basis of probable cause is somehow more limited when a cell phone is at issue.

### A. The Affidavit Presented Probable Cause.

Probable cause "is not a high bar." *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (citation omitted). It "is a fluid concept[,] turning on the assessment of probabilities in particular factual contexts," and "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Gates*, 462 U.S. at 242-44 & n.13. Authorities must make "common-sense conclusions about human behavior" based on "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Gates*, 462 U.S. at 231, 241 (citations omitted).

In reviewing an application for a search warrant, magistrate judges assess probable cause "in a commonsense and realistic fashion," recognizing that such applications "are normally drafted by nonlawyers in the midst and haste of a criminal investigation." *United States v. Ventresca*, 380 U.S. 102, 108 (1965). The court must consider the facts in their totality, not through a "divide and conquer" dissection. *United States v. Arvizu*, 534 U.S. 266, 274 (2002).

A magistrate's "determination of probable cause should be paid great deference by reviewing courts." *Gates*, 462 U.S. at 236 (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)). "The Supreme Court has clearly indicated that the conclusions of a neutral magistrate regarding probable cause are entitled to a great deal of deference by a reviewing court, and the temptation to second-guess those conclusions should be avoided." *United States v. Ritter*, 416 F.3d 256, 264 (3d Cir. 2005).

Thus, the only question is whether the affidavit presented a "substantial basis" supporting the magistrate judge's conclusion. In *Massachusetts v. Upton*, 466 U.S. 727 (1984), therefore, the Court held that the state appellate court

> erred in failing to grant any deference to the decision of the Magistrate to issue a warrant. Instead of merely deciding whether the evidence viewed as a whole provided a "substantial basis" for the Magistrate's finding of probable cause, the court conducted a de novo probable-cause determination. We rejected just such after-the-fact, de novo scrutiny in *Gates*...."A grudging or negative attitude by reviewing courts toward warrants," *United States v. Ventresca*, 380 U.S. 102, 108 (1965), is inconsistent both with the desire to encourage use of the warrant process by police officers and with the recognition that once a warrant has been obtained, intrusion upon interests protected by the Fourth Amendment is less severe than otherwise may be the case. *Gates*, *supra*, at 237 n.10. A deferential standard of review is appropriate to further the Fourth Amendment's strong preference for searches conducted pursuant to a warrant.

*Massachusetts v. Upton*, 466 U.S. at 732-33. In sum, "doubtful or marginal cases in this area should be largely determined by the preference to be

accorded to warrants." *United States v. Stearn*, 597 F.3d 540, 554 (3d Cir. 2010) (citing *Gates*, 462 U.S. at 237 n.10).

### 1. The facts presented in the warrant established probable cause that material evidence would be found in the cell phones.

Under the facts of this case and relevant legal precedent, there is little question that LaCosta-Franco was dealing drugs and that a search of her phones would probably reveal evidence of those crimes. At the very least, the magistrate judge had a substantial basis for finding probable cause. The present case is anything but doubtful or marginal.

This Court has already and repeatedly rejected the reasoning applied by the district court in a series of cases reviewing search warrants of residences inhabited by drug dealers, explaining that "[w]hen the crime under investigation is drug distribution, a magistrate may find probable cause to search the target's residence even without direct evidence that contraband will be found there." *Stearn*, 597 F.3d at 558; *see also United States v. Burton*, 288 F.3d 91, 104 (3d Cir. 2002); *United States v. Hodge*, 246 F.3d 301, 306 (3d Cir. 2001); *United States v. Whitner*, 219 F.3d 289, 297-98 (3d Cir. 2002). "In a series of cases beginning with *Whitner*, [this Court] recognized that evidence associated with drug dealing needs to be stored somewhere, and a dealer will have the opportunity to conceal it in

his home. After all, a dealer could logically conclude that his residence is the best, and probably the only, location to store items such as records, cash, guns, and large quantities of drugs to be sold." *Stearn*, 597 F.3d at 558 (internal quotations and ellipses omitted).

This strong line of precedent controls the outcome of this case insofar as its reasoning applies with at least equal if not greater force to the cell phones of drug dealers. The Supreme Court recognized: "Cell phones have become important tools in facilitating coordination and communication among members of criminal enterprises, and can provide valuable incriminating information about dangerous criminals." *Riley v. California*, 573 U.S. 373, 401 (2014). It is particularly "well established that '[c]ell phones and firearms are generally considered the 'tools of the trade' of drug traffickers.'" *United States v. Griffith*, 598 F. Supp. 3d 221, 237 (M.D. Pa. 2022), *aff'd*, 2024 WL 5053426 (3d Cir. 2024) (citations omitted). *See also, e.g., Gorny*, 2014 WL 2860637, at *6 ("Cell phones and firearms are generally considered the 'tools of the trade' of drug traffickers, which the involved detectives fully understood and conveyed to the magistrate judge."); *United States v. Batista*, 2024 WL 5053262, at *4 (10th Cir. 2024) (unpublished).

Other federal appeals courts have reached this conclusion. The Eighth Circuit ably explained:

> We note first that cell phones are now so widespread as to be ubiquitous. *See Riley*, 573 U.S. at 395. There is no reason to suspect that drug dealers are any less likely than regular people to have and use a cell phone….In fact, given the nature of the business and the need for easy and instantaneous communication with buyers, drug dealers may be even more likely to use cell phones. If firearms are "tool[s] of the [drug] trade," as we have often said, there is little reason to believe that cell phones are not.

*United States v. Eggerson*, 999 F.3d 1121, 1125 (8th Cir. 2021). As one Court of Appeals put it: "the Supreme Court has…noted that searching one's smartphone is like searching his home." *United States v. Orozco*, 41 F.4th 403, 411 n.9 (4th Cir. 2022). Accordingly, "just as it is sometimes reasonable to believe that a suspect's home may contain evidence of their crimes, it might be reasonable to believe that his cellphone will at least for crimes like drug trafficking that involve coordination." *United States v. Davis*, 94 F.4th 310, 319-20 (4th Cir. 2024).

The type of warrant presented here is therefore common, and the facts in this case were particularly compelling, given the manifest evidence of LaCosta-Franco's drug dealing and the proximity of the cell phones to that activity, with both the phones and substantial quantities of narcotics on her person at the time she was apprehended. As set forth in Agent Scanlan's affidavit, the facts established that at the time of her arrest,

LaCosta-Franco was in sole possession of a stolen vehicle, wearing latex gloves, and possessing on her person a variety of controlled substances, including 50 packets of fentanyl, a vial of heroin, and crack cocaine, along with two cell phones at issue in this appeal (that she tried to hide in her pockets). App. 54-56. In addition, on the driver's seat where LaCosta-Franco had been sitting, officers found 1.5 kilograms of heroin. App. 55. And in a backpack, which contained gloves and packaging material matching the items found on LaCosta-Franco's person, officers found substantial additional quantities of cocaine, fentanyl, and other drugs and paraphernalia. App. 55. The backpack also contained items with personal identifying information belonging to possible co-conspirators, including a Pennsylvania driver's license and a pill bottle. App. 55.

In short, the cell phones in question were found on LaCosta-Franco herself. They were found while she was transporting significant quantities of controlled substances, including on her person and her seat. And there were two phones. *See United States v. Morton*, 46 F.4th 331, 338 (5th Cir. 2022) ("Morton had multiple phones in his car along with the drugs, which our court and others have recognized can indicate that the phones are being used for criminal activity." (citing cases)). These facts are not just generic evidence of drug dealing: they are specific and objective facts relating to

*these* cell phones explaining why they probably would contain evidence of LaCosta-Franco's crimes.

At no point in the district court's 13-page analysis did the court discuss any of these facts, let alone consider what reasonable inferences could be drawn from them. App. 18-30. The district court's failure to give any weight to these facts, or any deference to the magistrate judge's assessment, was reversible error. *See Stearn*, 597 F.3d at 555.

Applying those reasonable inferences, as Magistrate Judge Wells did, the evidence supports the determination that LaCosta-Franco was a significant drug trafficker who was carrying cell phones for the same reason she was also carrying the other drugs and drug paraphernalia on her person and in her bags and car—for use in a substantial drug trafficking operation. There was probable cause that specific items found from her person, her bags, and her vehicle at that time and place—even if innocuous in another context—would contain evidence of that drug trafficking operation.

This is precisely the sort of inference that was reasonable for a magistrate to make, that requires "great deference" by this Court, and— most importantly—is exactly the inference this Court has blessed in the context of drug dealers and their homes in *Williams*, *Stearn*, *Whitner*, *Burton*, and *Hodge*. In fact, this case has even stronger facts than those

cases given that the premises in question—cell phones—were physically tied to the defendant and her drug dealing in ways that were not present in other cases.

No drug trafficker—including LaCosta-Franco—could plausibly conduct a drug trafficking operation without a cell phone to communicate with suppliers, coconspirators, and buyers to acquire and amass a stash of narcotics, coordinate storage and distribution, set pricing and financial terms, sell to buyers, etc. This is why cell phones are indeed, as experienced drug investigators know and Agent Scanlan asserted, "tools of the drug trade." In the modern day, LaCosta-Franco probably (to use the terminology of probable cause) used a cell phone to abet drug trafficking, and there was at least a "fair probability" that evidence related to that drug trafficking would be found on the cell phones. At a minimum, that was the judgment of Judge Wells. The district court did not have to agree with that judgment to uphold the warrant. *United States v. Jones*, 994 F.2d 1051, 1057 (3d Cir. 1993).

Moreover, the lone fact that the court addressed—LaCosta-Franco's possession of multiple cell phones—was considered in isolation. The "totality-of-the circumstances test 'precludes this sort of divide-and-conquer analysis.'" *Wesby*, 583 U.S. at 61 (quoting *Arvizu*, 534 U.S. at 274).

Instead, the district court was required to consider the facts as a whole. Had it done so, it would have considered LaCosta-Franco's possession of multiple cell phones alongside the other facts surrounding her arrest. And, it would have heeded the well-established principle in this Circuit that possession of multiple cell phones can be evidence of drug trafficking activity—especially when present among other facts indicating narcotics trafficking. *See, e.g.*, *United States v. Tutis*, 845 F. App'x 122, 125 (3d Cir. 2021) (not precedential).

Rather than address all of the pertinent facts, and defer to the magistrate's assessment, the court concluded that the agent presented only his "training and experience," without stating the link of the cell phones to criminal conduct. But the court overlooked that, while an affiant may suggest conclusions in his presentation, that ultimately is not his role. Rather, the affiant's obligation is to present facts, and it is fundamentally the role of the magistrate to conclude whether those facts, and any reasonable inferences that may be drawn from the facts, meet the legal threshold of probable cause. "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him...there is a fair probability that contraband or evidence of a crime will be found in a

particular place." *Gates*, 462 U.S. at 238. The inferences are to be drawn "by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Id.* at 240 (quoting *Johnson v. United States*, 333 U.S. 10, 13-14 (1948)). Then, once the magistrate has made a factual judgment finding probable cause, both the district court and an appellate court "must...give great deference to the magistrate judge's probable cause determination." *Hodge*, 246 F.3d at 305.

Here, the district court repeatedly posited that the only connection presented in the affidavit between the defendant's conduct and the use of a cell phone was the agent's "boilerplate" observations about the typical conduct of drug traffickers. *See, e.g.*, App. 6 ("upholding a cellphone warrant relying entirely on an officer's training and experience would mean that any phone recovered from an arrestee is subject to search for any crime imaginable."); App. 23 ("The way in which these 'training and experience' or 'trust me' warrants divine a defendant's alleged cellphone use reveals nothing different than the way any free citizen uses a cellphone in the normal course."). Then, in the discussion of the good faith doctrine, the court expounded:

> A summary of [the] Government's "evidence" in this case amounts to:
> Defendant was found with large quantities of drugs and has two

> phones; therefore, she is likely a drug trafficker. Further, in Agent Scanlan's experience, drug traffickers typically store information about their crimes on their phones. Government insists this is sufficient to establish probable cause and, alternatively, certainly enough for a reasonable officer to believe probable cause exists. This Court unequivocally disagrees. Without any evidence, direct or indirect, connecting Defendant's phone to a crime, it is not possible to have a reasonable and *objective* belief probable cause exists.

App. 34. This discussion paid insufficient attention to the actual facts stated in the affidavit, and the quite reasonable inferences the magistrate could draw.

The affidavit did not simply set forth that LaCosta-Franco "was found with large quantities of drugs and has two phones." Rather, at the time of apprehension, she was in sole possession of a stolen vehicle, wearing latex gloves, and possessing on her person a variety of controlled substances, including 50 packets of fentanyl, crack cocaine, and heroin. In addition, on the driver's seat where the defendant had been sitting, officers found 1.5 kilograms of heroin. And in a backpack, which contained gloves and packaging material matching the items found on the defendant's person, officers also found substantial additional quantities of cocaine, fentanyl, and other drugs and paraphernalia.

Maybe it is possible in some strange scenario that LaCosta-Franco was just handed the keys to the truck by a passerby, donned the gloves and the cross-body bag containing contraband, and had no electronic

communications with anyone in advance. But of course, the reasonable inference is that she was a significant trafficker who had to coordinate with others to amass this vast stash of drugs and the accoutrements of drug trafficking, and used a cell phone to do so.

The one and a half kilograms of heroin on her seat alone establishes this. Perhaps if someone were arrested in possession of a personal-use quantity of heroin, then the judge's concern of the absence of a link to a phone might have weight. In such a case, it may be speculative whether the defendant used a phone to acquire the drugs, or simply walked up to a seller on the street and bought it. But where we are dealing with 1.5 kilograms of heroin, it's probable (closer to obvious) that the defendant was in contact with others to acquire it, and to arrange to resell it. It is essentially impossible that she herself grew the poppies, extracted morphine from the poppy seeds, then also produced the chemicals used in her personal lab to create heroin from the extracted morphine, and finally, planned to consume it all herself. She bought the heroin or was entrusted with it by a confederate, and she planned to distribute it, and in the modern day, that means she probably used a cell phone to accomplish all this.

The fact that the affiant did not explicitly connect these dots is not dispositive. It is the role of the magistrate to draw reasonable inferences

from the facts and make a probable cause determination. This Court recently confirmed: "The officer's sole job in drafting the affidavit of probable cause is to provide the neutral decisionmaker with sufficient information for an independent probable cause determination. His job is not to make his own determinations." *Kendig v. Stolar*, 173 F.4th 466, 472 (3d Cir. 2026). Here, the magistrate judge had an ample basis for the finding of probable cause.

The district court stated: "This is not to say that the affiant in this matter needed to conduct an undercover buy through Defendant's cellphone to establish probable cause. But *something* in the way of objective information related to Defendant's phones is needed to buttress the officer's training and experience." App. 28-29. *See also* App. 30 (the officer "must advance some baseline theory that is specific to defendant's incorporation of the cellphone into the alleged criminal activity. Here, there is nothing in the warrant, 'besides the [agent's] *ipse dixit* 'training and experience' which would create probable cause the phone contained evidence of the crime in question.'") (citation omitted). These statements simply ignored the extent and the import of the facts presented to the magistrate judge in this case, which established probable cause.

**2. The affidavit properly supported a finding of probable cause that evidence would be found in the phones; proof that the phones were specifically used to commit the charged crimes is not required.**

The court's approach, instead, was idiosyncratic. Its opinion was based on its view that the "trend of persuasive authority counsels that an affidavit of probable cause must include objective, offense-specific facts—be they direct or indirect—connecting the crimes charged with the specific use of the cellphone and its contents." App. 19. This analysis misstates the focus of the Fourth Amendment.

Probable cause hinges on whether a cell phone (or any other item to be searched) is likely to contain evidence of a crime—not whether that device was likely used in the commission of the crime. *See Gates*, 462 U.S. at 238 (warrant must establish a "fair probability that contraband or evidence of a crime will be found in a particular place").

Thus, in *United States v. Whitner*, 219 F.3d 289 (3d Cir. 2000), where the defendant was arrested, away from his home, in possession of a large quantity of drugs, this Court held that an affidavit presented sufficient probable cause to support a search of the residence. Citing numerous supportive cases from other courts, this Court explained:

> The rationale underlying the foregoing line of cases is that evidence associated with drug dealing needs to be stored somewhere, and that

a dealer will have the opportunity to conceal it in his home. After all, a dealer logically could conclude that his residence is the best, and probably the only, location to store items such as records of illicit activity, phone books, address books, large amounts of cash, assets purchased with proceeds of drug transactions, guns to protect drugs and cash, and large quantities of drugs to be sold.

*Whitner*, 219 F.3d at 298. *Accord Burton*, 288 F.3d at 103. These cases make clear that direct evidence linking a location to the crime is not required. *See also Stearn*, 597 F.3d at 558 ("When the crime under investigation is drug distribution, a magistrate may find probable cause to search the target's residence even without direct evidence that contraband will be found there.").

The analysis presented in *Whitner* and other cases applies with full force here: a drug trafficker has to communicate in some manner to acquire and distribute a large quantity of controlled substances, and her cell phone is the most likely means. The district court erred in instead requiring evidence showing the use of a phone in the crime.

The Third Circuit explained in *Stearn*, another case involving probable cause to search a residence for evidence of drug crimes, that the "reasonable inference...that drug dealers often store evidence of drug crimes in their residence" must be "based on evidence supporting three preliminary premises: (1) that the person suspected of drug dealing is actually a drug dealer; (2) that the place to be searched is possessed by, or

the domicile of, the dealer; and (3) that the home contains contraband linking it to the dealer's activities." *Id.* at 559. Several factors can help to establish the required nexus: "large-scale operations, a defendant's attempts to evade officers' questions about his address, the conclusions of experienced officers 'regarding where evidence of a crime is likely to be found,' the proximity of the defendant's residence to the location of criminal activity, probable cause to arrest the defendant on drug-related charges, and the tip of a 'concerned citizen' that a specific stolen item would be found in the defendant's residence." *Id.* (internal citations omitted).

The district court acknowledged this case law and the factors it set forth, but, puzzlingly, declined to apply them. App. 25-26. However, the preliminary premises and associated factors used by this Circuit to determine whether an affidavit establishes probable cause to search a suspected drug house apply with full force to the search of LaCosta-Franco's cell phones. To begin, there was ample evidence that LaCosta-Franco was, in fact, a drug dealer, as explained at length above. Further, police found the two cell phones on LaCosta-Franco's person—clearly establishing the place to be searched was possessed by LaCosta-Franco. On the third preliminary premise, the factors favor a finding that LaCosta-Franco's phones contain evidence linking it to her drug trafficking, for all of

the reasons set forth in this brief. And Agent Scanlan explained how his experience and training supported the conclusion that there was probable cause to believe evidence of drug trafficking would be found on the cell phones. "The magistrate judge was entitled to 'give considerable weight to the conclusions of [this] experienced law enforcement officer regarding where evidence of a crime was likely to be found.'" *Hodge*, 246 F.3d at 307 (quoting *Whitner*, 219 F.3d at 296). Lastly, police had probable cause to arrest LaCosta-Franco on drug-related charges, which made it more likely that drug-related evidence would be found on her cell phones. *See id.*

In sum, the facts and opinions presented provided probable cause that evidence related to the crimes, including proof of how and with whom LaCosta-Franco obtained the extensive contraband and planned to distribute it, would be found in the cell phones.

### 3. There is no special protection for cell phones.

The district court's approach seemed particularly grounded in its view that cell phones somehow merit additional constitutional protection. The court stated, "The ubiquity and technology of smartphones occupy a unique space in the present-day[,] and the Supreme Court has at least suggested in

*Riley* and *Carpenter* that Courts should think about them differently." App.

26. This analysis is wrong.

> The court stated:
>
> We all rely on them in our daily lives; they have become our primary method of communication replacing landlines, they have replaced personal computers in many households, their navigation tools replaced our paper maps, there is no longer a need for file cabinets as they retain our medical history, banking records, our family photographs, correspondence and often host personal diaries replacing the need to hide a paper journal under the mattress.

App. 5. But these undisputed facts should produce the opposite conclusion: because cell phones are so important in everyday communications and personal affairs, it is more likely that evidence related to criminal conduct, as regarding any endeavor, will be found on the suspect's smartphone.

At the time of adoption of the Fourth Amendment, people not only did not own electronic devices, but few had storage areas, offices, or any other place to keep personal papers and goods other than their residences. The sanctity of a home was therefore the primary concern of the Fourth Amendment. Wiliam J. Cuddihy, *The Fourth Amendment: Origins and Original Meaning 602-1791*, lix-lxvii (Oxford Univ. Press 2009); *Florida v. Jardines*, 569 U.S. 1, 6 (2013) ("At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" (quoting *Silverman v. United*

*States*, 365 U.S. 505, 511 (1961)). But that did not limit the ability of authorities to search throughout a home upon a finding of probable cause by a neutral magistrate. The same authority logically applies to a smartphone in the modern day. And indeed, just as one could conclude in colonial times that a criminal likely possessed evidence in his home, given that he probably had nowhere else to keep contraband or papers, likewise today the conclusion is inescapable that in any endeavor involving group or coordinated activity it is at the very least probable that pertinent evidence will be found on the suspect's phone.

Thus, the district court's "semantic exercise" proves nothing. The court deemed it problematic that, just as one could say "drug dealers use their phones to communicate with each other to arrange transactions," one could replace the term "drug dealers" with "judges" or "law-abiding citizens" and make the same statement. App. 24. Of course that is true. But it does not defeat the fact that, if there is evidence that a person is a drug dealer, a magistrate may conclude that a drug dealer like any other modern person uses a cell phone to carry on her business.

Likewise, in declaring that cell phones are "tools of the trade" of drug trafficking, it is irrelevant that they are likewise tools of countless other legitimate trades. Once there is probable cause that a person is a substantial

drug trafficker, it follows that it is probable that she uses a cell phone in this enterprise (just as it is probable that an attorney during the course of his or her day uses a cell phone to legitimately communicate with clients, courts, witnesses, etc.).

The government is not asserting that probable cause exists to search an offender's cell phone in relation to any crime.[4] Even in drug prosecutions, there will likely be cases in which the link is insufficient. If a person is caught on the street, for instance, in possession of a user-quantity of narcotics, one could argue that it is very likely this was the product of a street sale that did not require the use of a cell phone. But that is a far cry from the facts presented here.

It is because cell phones are ubiquitous that there likely is probable cause to search a phone in relation to a crime that involved planning and coordination. The fact that no conspiracy charge is presented is not

---

[4] One of the few cases cited by the district court, a magistrate judge's opinion in *In re Search of One Device & Two Individuals Under Rule 41*, 783 F. Supp. 3d 183, 192-93 (D.D.C. 2025), illustrates this point. There, the defendant was charged only with illegal possession of a gun, and the incident at issue took place in seconds, when officers tackled him and a gun fell from his possession. There was no evidence that a cell phone had any connection to this alleged crime, and the magistrate refused to rely solely on the affiant's claim, based on training and experience that was asserted but not detailed, that an offender might, for instance, keep a photo of the gun on his phone.

controlling.[5] If a person tells a companion the live score of a baseball game, it is probable that she used her phone to look up the score. If one meets a friend at a park on the other side of town at a specific time, it is probable that each used a cell phone to coordinate, and also used maps on their phones to get there. And on and on. This is modern life. And likewise, if a person is caught in possession of an extremely large quantity of narcotics, it is probable that she used her phone to arrange to acquire it and probably also to prepare to later sell it. The bottom line is that the fact that cell phones are now used for all transactions and interactions in contemporary life is not conceivably a reason to prevent law enforcement from looking at them when a crime is committed. The opposite is true.

Thus, the Third Circuit has held that, in the context of a search of a drug dealer's residence, "If there is probable cause to believe that someone committed a crime, then the likelihood that that person's residence contains evidence of the crime increases." *Jones*, 994 F.2d at 1055-56. In the modern day, the same logic applies to cell phones.

The district court incorrectly drew a different lesson from the decisions in *Riley v. California*, 573 U.S. 373 (2014), and *Carpenter v.*

---

[5] Indeed, the search warrant at issue here sought evidence of both possession with intent to distribute, in violation of 21 U.S.C. § 841(a), and conspiracy, in violation of 21 U.S.C. § 846.

*United States*, 585 U.S. 296 (2018). In *Riley*, the Court recognized that cell phones are "a pervasive and insistent part of daily life," "have become important tools in facilitating coordination and communication among members of criminal enterprises, and can provide valuable incriminating information about dangerous criminals." *Riley*, 573 U.S. at 385. In the district court's view, because cell phones are ubiquitous, they are subject to heightened protections under the Fourth Amendment. The court therefore created a bright-line rule applicable to cell phones: "[P]robable cause must include objective, offense-specific facts—be they direct or indirect— connecting the crimes charged with the specific use of the cellphones and its contents." App. 19.

This rule finds no support in the Fourth Amendment. In *Riley*, the Supreme Court held only that police cannot conduct a *warrantless* search of the defendant's cell phone incident to arrest. 573 U.S. at 378-81. The Court emphasized that its holding "is not that the information on a cell phone is immune from search; it is instead that *a warrant is generally required before such a search*, even when a cell phone is seized incident to arrest." *Id.* at 401 (emphasis added). Similarly, in *Carpenter*, the Supreme Court held that the government must generally obtain a warrant supported by probable cause before acquiring cell site location information.

*Carpenter*, 585 U.S. at 316. In those cases, the Supreme Court never suggested, let alone held, that law enforcement must meet a more exacting probable cause standard to search a cell phone. The instruction was, instead, to "get a warrant." *Id.* at 317. The government followed that command here, seeking a warrant that was carefully limited to permit a search only for evidence of specific crimes during a narrow time period.

There is thus no published decision in this Circuit establishing a heightened probable cause requirement for cell phone searches.[6] The district court instead relied on several out-of-Circuit district court decisions and a pair of Sixth Circuit decisions for what it characterized as the "trend of persuasive authority" justifying its bright-line rule. However, the Sixth Circuit decisions cited by the district court—*United States v. Merriweather*, 728 F. App'x 498 (6th Cir. 2018) (unpublished), and *United States v. Sheckles*, 996 F.3d 330 (6th Cir. 2021)—do not actually adopt the district court's proposed nexus test. To the contrary, as the Sixth Circuit

---

[6] In *United States v. Brewer*, 708 F. App'x 96 (3d Cir. 2017) (not precedential), this Circuit affirmed a warrant to search the defendant's cell phone based on facts showing the defendant had participated in the charged robbery, and had claimed ownership of the cell phone seized from his person. *Id.* at 99-100. *Brewer* supports a finding of probable cause to search LaCosta-Franco's cell phone, as here there was ample evidence in the affidavit establishing her participation in the charged drug crimes, and she was in possession of multiple cell phones at the time of her arrest that she attempted to conceal.

- 46 -

summarized in *United States v. Tanzil*, the Sixth Circuit has considered

"two potential nexus standards in the cell phone context"—one that would

"require an affidavit to make 'factual allegations' that the 'cell phone to be

searched *itself* is being used in connection with criminal activity," and

another that mirrors the "traditional probable cause inquiry"—but has

repeatedly declined to resolve the question, instead applying the good faith

exception. *Tanzil*, 2025 WL 3244494, at *3 (6th Cir. 2025) (unpublished;

cleaned up).[7]

---

[7] The three district court opinions cited by the district court also did not support its analysis, as all are inapposite. One, the magistrate judge's opinion in *In re Search of One Device & Two Individuals Under Rule 41*, 783 F. Supp. 3d 183 (D.D.C. 2025), is discussed in an earlier footnote.

The court cited *United States v. Ramirez*, 180 F. Supp. 3d 491 (W.D. Ky. 2016), but that matter involved a truly barebones application, which only advised that the defendant had been arrested on a drug conspiracy charge, that he was in possession of a phone at the time of his arrest, and that the detective was aware "through training and field experience that individuals may keep text messages or other electronic information stored in their cell phones which may relate them to the crime and/or co-defendants/victim." No facts at all were presented regarding the alleged criminal conduct, or any opinion linking the use of a cell phone to such conduct.

Finally, the decision in *United States v. Opoku*, 556 F. Supp. 3d 633 (S.D. Tex. 2021), cited by the district court, concerned a warrant to search a cell phone for evidence of a murder, where the phone was seized four months after the murder in question. Critically, the affidavit failed to advise that police had seized a different cell phone from the defendant three days after the murder, a fact that seriously undermined the idea that evidence

*continued . . .*

Moreover, review of the decisions of other Circuits confirms the "trend of persuasive authority" points quite clearly, in fact overwhelmingly, in the opposite direction. For instance, in *United States v. Silva*, 146 F.4th 186 (2d Cir. 2025), the Second Circuit decided "under what circumstances, in a warrant application, an affiant's claim of expertise regarding the type of crimes the target of the investigation allegedly committed can support the requisite linkage between the purported crimes and the places to be searched," in that case, a cell phone. *Id.* at 186. In *Silva*, law enforcement obtained a search warrant to search a cell phone seized incident to the defendant's arrest for a firearms offense. The affidavit in support detailed the police officer's conversations with a confidential informant, who stated that the defendant belonged to a gang and had committed various firearms, racketeering, and wire fraud offenses. *Id.* at 187. To establish a link between the alleged crimes and the cell phone, the affiant summarized his

---

related to the murder would be found on a second phone seized four months later. Further, the court noted, with regard to the murder and related events (which were captured on video), "the Affidavit does not contain a single allegation regarding coordination of any of the offenses or the use of a cellphone before, during, or after even one of the alleged crimes." *Id.* at 644. In this context, the court held that a simple statement that gang members (three of whom were allegedly involved in the crime) use cell phones to arrange violent crimes was insufficient. This case bears no relation to the present matter, which involved large-scale drug trafficking, and where the defendant was in possession of the two phones at issue at the moment she was apprehended.

experience in gang and homicide investigations, including "the manner in which violent crimes are planned and executed," the "way gangs operate," and the "manner in which gang members and individuals engaged in violent crime use cell phones in connection with such activity." *Id.* The affiant further asserted that individuals such as the defendant "often use" their cell phones to "arrange and coordinate their illicit activities"; "often have" inculpatory "photographs and videos" of "the tools and proceeds of their criminal activities (such as firearms and cash proceeds)" on such devices; and "frequently use cellular devices to coordinate their flight and evade law enforcement." *Id.* The magistrate judge issued the warrant, but the district court granted the defendant's motion to suppress, finding the warrant lacked probable cause, because there were no facts showing the defendant used the cell phone in connection with his alleged criminal conduct. *Id.* at 188, 190.

The Second Circuit reversed. It held that although "[a]llegations tending to show that the target used his cell phone in furtherance of criminal conduct *suffice* to establish probable cause," they are not "*necessary.*" *Id.* at 190 (emphases added). Further, the Second Circuit concluded that law enforcement expertise, combined with case-specific factual allegations, can establish the requisite nexus between the alleged

crime and the place to be searched. *Id.* The panel highlighted several case-specific facts that supported a probable cause showing—namely, the defendant's alleged involvement in a gang, which made it likely the defendant communicated with other members of the gang, and the type of crime involved (identity theft), which "might reasonably implicate the only electronic device found on his person at the time of his arrest." *Id.* at 192.

*Silva* is on point. As explained at length above, similar "case-specific facts" in conjunction with the affiant's explanation of the characteristics of drug trafficking offenses provided a substantial basis for the magistrate judge's probable cause determination here.

The Eighth Circuit holding in *United States v. Ivey*, 91 F.4th 915 (8th Cir. 2024), also points in the opposite direction of the district court's "trend of persuasive authority" and supports a finding of probable cause in this case. In *Ivey*, the defendant was charged with unlawful possession of a firearm as a felon after police recovered a firearm from the defendant's car during a traffic stop. *Id.* at 917. The police also seized a cell phone from the defendant and applied for a warrant to search the device for evidence related to firearms, ammunition, and possession and ownership of the seized firearm. *Id.* In support of the warrant, the affiant stated the facts supporting the arrest, including the defendant's possession of the cell

phone at the time of arrest, and further "explained that in his training and experience, offenders often use social media to talk about their crimes and to post images of their activities." *Id.* at 917-18. Based on these facts, the Eighth Circuit concluded "[t]here was a fair probability that evidence connecting Ivey to a firearms offense would be present in his phone." *Id.* at 918. Further, in an earlier decision, the Eighth Circuit agreed with the magistrate judge's determination that it was "reasonable to infer that cell phones found at a location associated with drug trafficking and on the person of an individual associated with [drug trafficking] had a fair probability of containing evidence of the crime." *Eggerson*, 999 F.3d at 1127. The *Eggerson* court continued: "It would be unreasonable and impractical to demand that judges evaluating probable cause must turn a blind eye to the virtual certainty that drug dealers use cell phones." *Id.*

Many decisions are consistent. *See, e.g., United States v. Orozco*, 41 F.4th 403, 411 n.9 (4th Cir. 2022) (while there was direct evidence that the defendant used his cell phone during a crime, the court observes that "just as it is sometimes reasonable to believe that a suspect's home may contain evidence of their crimes, it might be reasonable to believe that his cellphone will. At least this might be true for crimes like drug trafficking that involve coordination."); *United States v. Lindsey*, 4 F.4th 32, 39-40 (1st Cir. 2021)

(the affidavit established probable cause to search the defendant's cell phones where it alleged the defendant "had been engaged in drug dealing and that he had had delivered drugs in his car to various locations," and further explained that the defendant had more than one cell phone, which is common among drug dealers; the court explicitly rejected the defendant's argument that "ruling against him will 'advance[] a rule that automatically permits the search of any cellphone whose owner has been engaged in drug activity, even when there is no specific evidence that the phone was used to transact any illicit business, so long as the affidavit includes a generalized statement that drug dealers often use cellphones to conduct their business,'" based on the fact the defendant had multiple cellphones); *United States v. Adams*, 971 F.3d 22, 32-33 (1st Cir. 2020) (an affidavit established probable cause to search five cell phones seized from the defendant's car after a traffic stop, where it alleged the facts surrounding the traffic stop, the $500 found on the defendant's person, two positive dog sniffs, and paraphernalia recovered from the vehicle, as well as the defendant's earlier arrests for drug trafficking); *Clark v. United States*, 2020 WL 4668918, at *2 (11th Cir. 2020) (unpublished) (holding "law enforcement officers had probable cause to obtain a warrant to search the cell phone because it was found in a truck with two kilograms of heroin and

$24,000 of loose currency during the investigation into the heroin-distribution conspiracy").

Thus, the district court's heightened test conflicts with the holdings of other Circuits, and basic Fourth Amendment jurisprudence. There is no requirement of a proven link between the alleged crime and use of a cell phone; rather, what is required, as in any application of the Fourth Amendment, is a showing of a probability that evidence related to the crimes will be found in the phone. Here, the facts presented in the warrant, buttressed by the experienced agent's knowledge of the conduct of drug traffickers, presented ample probable cause justifying the magistrate judge's conclusion.[8]

---

[8] Carried to its logical extreme, the district court's approach would also restrict searches of residences, computers, and other places that are used on a daily basis to carry on all facets of life. There is an endless amount of private information in those places, as well as in cell phones. The remedy is not to impose a heightened nexus requirement, showing a direct link between use of the place and criminal activity. The remedy under the Fourth Amendment is to obtain a warrant, from a neutral and detached magistrate, showing probable cause that evidence related to a crime may be found in the location, and then to limit the search, by location and temporal restrictions, to areas where that evidence may be found. That is exactly what the agent properly obtained in this case.

**B.     The Good Faith Exception Applies.**

Alternatively, even if probable cause is somehow found lacking with respect to the warrant, the exclusionary rule may not apply upon application of the good faith exception.

The exclusionary rule is a "judicially created remedy" designed to "safeguard Fourth Amendment rights generally through its deterrent effect." *United States v. Leon*, 468 U.S. 897, 906 (1984) (citation omitted). The Supreme Court has emphasized, however, that suppression is an "extreme sanction," *id.* at 916, because the "exclusion of relevant incriminating evidence always entails" "grave" societal costs, *Hudson v. Michigan*, 547 U.S. 586, 595 (2006). Most obviously, it allows "guilty and possibly dangerous defendants [to] go free—something that 'offends basic concepts of the criminal justice system.'" *Herring v. United States*, 555 U.S. 135, 141 (2009) (quoting *Leon*, 468 U.S. at 908). As the purpose of the exclusionary rule is to deter misconduct of law enforcement officers, *Leon* held that the rule does not apply where a mistake is one of the reviewing magistrate, and an officer relied in objective good faith on that ruling.

Agent Scanlan's good faith is evident in the fact that he presented a detailed and compelling affidavit—42 paragraphs long—seeking judicial approval. Further, Agent Scanlan's good faith was also bolstered by the fact

that he submitted the affidavit for review by a prosecutor, as the district court acknowledged. App. 35 n.20. Courts have repeatedly held that consultation with a prosecutor is a factor in weighing an officer's good faith. *See, e.g.*, *Messerschmidt v. Millender*, 565 U.S. 535, 553-54 (2012); *United States v. Katzin*, 769 F.3d 163, 181 (3d Cir. 2014) (en banc). In *Messerschmidt*, the Supreme Court stated: "On top of all this, the fact that the officers sought and obtained approval of the warrant application from a superior and a deputy district attorney before submitting it to the magistrate provides further support for the conclusion that an officer could reasonably have believed that the scope of the warrant was supported by probable cause." 565 U.S. at 553. The district court acknowledged this fact, only to state that "[l]egal review of a warrant's sufficiency should increase efficacy." App. 35 n.20. By failing to consider how prosecutor review supported the conclusion that Agent Scanlan reasonably believed that the warrant was supported by probable cause, the district court erroneously dismissed evidence of good faith.

Further, the warrant here was supported by compelling evidence that LaCosta-Franco was engaged in drug trafficking with likely confederates, and it could be reasonably inferred that she used a cell phone in furtherance of her drug dealing. This is especially true where, as here,

Agent Scanlan explained how, in his training and experience, drug dealers use their cell phones to perpetrate their illegal endeavors. The showing of probable cause was exceptionally strong, and at the very least, Agent Scanlan could rely in good faith on the magistrate's approval. The court's conclusion that the affidavit consisted only of the agent's "training and experience," and nothing more, does not withstand even minimal scrutiny.

The Supreme Court held:

> Where the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or, as we have sometimes put it, in "objective good faith." *United States v. Leon*, 468 U.S. 897, 922-923 (1984). Nonetheless, under our precedents, the fact that a neutral magistrate has issued a warrant authorizing the allegedly unconstitutional search or seizure does not end the inquiry into objective reasonableness. Rather, we have recognized an exception allowing suit when "it is obvious that no reasonably competent officer would have concluded that a warrant should issue." [*Malley v. Briggs*, 475 U.S. 335, 341 (1986).] The "shield of immunity" otherwise conferred by the warrant, *id.*, at 345, will be lost, for example, where the warrant was "based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Leon*, 468 U.S., at 923 (internal quotation marks omitted).

> Our precedents make clear, however, that the threshold for establishing this exception is a high one, and it should be. As we explained in *Leon*, "[i]n the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination" ....

*Messerschmidt*, 565 U.S. at 546-48. The question in this case, then, boils down to this: would "a reasonably well-trained officer…have known that the search was illegal despite the magistrate's authorization"? *Leon*, 468 U.S. at 922 n.23. The answer here is plainly no.

Contrary to the court's suggestion, nowhere in the affidavit did Agent Scanlan profess to "believe that any time a defendant is arrested with a cellphone the contents of that phone would be subject to search[.]" App. 32. In fact, Agent Scanlan repeatedly tied his recitation of probable cause to the fact that LaCosta-Franco appeared to be engaging in not just "any" crime, but a significant drug trafficking crime that almost certainly involved coordination with one or more confederates. The court also ignored that numerous other courts, as the district court appears to have conceded, App. 21-22, have held that similar facts are sufficient to establish probable cause to search a phone. Indeed, in granting the defendant's suppression motion, the court noted that it had apparently been unable to find any "controlling authority mirroring this factual context," App. 18 n.10, which strongly cuts against the court's later finding that the agent should have known that the warrant the magistrate judge issued was legally invalid. *See United States v. Katzin*, 769 F.3d 163, 179-81 (3d Cir. 2014) (en banc) (an officer acts

reasonably and in good faith where he acts consistently with the legal landscape at the time of his action).

Indeed, while many cases support the agent's position in this case, as explained above, we are not aware of a single decision anywhere that matches the district court's conclusion: that where a person is found in possession of a large quantity of narcotics, with packaging material and other accoutrements of drug trafficking, along with two cell phones, that there is not at least a probability that evidence related to the acquisition and intended distribution of the narcotics will be found on the phone, and that instead the affiant must present evidence linking the actual use of the phone to criminal activity. In this circumstance, it cannot conceivably be said that the agent did not act in good faith in relying on the magistrate judge's approval.

The court instead engaged in a detailed analysis of the facts and law—including district court decisions from several other Circuits—"analysis we neither expect nor require from 'nonlawyers in the midst and haste of a criminal investigation.'" *Stearn*, 597 F.3d at 563 (quoting *Ventresca*, 380 U.S. at 108). The court then produced a new rule, requiring evidence linking cell phone use to the crime itself, that does not appear in any

controlling precedent, and certainly could not be anticipated by an agent afforded judicial approval to proceed.

Lastly, the district court's characterization of Agent Scanlan's 15-page, 42-paragraph affidavit as "barebones" is not well taken. As established, the district court failed to "consider the affidavit in its entirety." *United States v. Mortimer*, 387 F. App'x 138, 142 (3d Cir. 2005) (not precedential) (rejecting argument affidavit was barebones). Although the court invoked the specter of a barebones affidavit, the district court did not address the case law showing a barebones affidavit is typically "a mere ratification of the bare conclusions of others." *Stearn*, 597 F.3d at 562 (quoting *Gates*, 462 U.S. at 239); *Gates,* 462 U.S. at 239 (characterizing as "bare bones" the affidavit in *Nathanson v. United States*, 290 U.S. 41 (1933), which stated only that the affiant "'has cause to suspect and does believe' that liquor illegally brought into the United States is located on certain premises"); *id.* (characterizing as bare bones the affidavit in *Aguilar v. Texas*, 378 U.S. 108 (1964), which included only "an officer's statement that '[affiants] have received reliable information from a credible person and do believe' that heroin is stored in a home"); *see also United States v. Leake*, 998 F.2d 1359, 1367 (6th Cir. 1993) (finding "bare bones" an affidavit based on an anonymous tip where the investigating officer merely

"posted himself outside the house for only two hours on two nights, where he observed absolutely nothing out of the ordinary").

Agent Scanlan's affidavit is not of this genre. He presented an affidavit with extensive factual detail, bolstered by his opinions based on lengthy experience. *See United States v. Morton*, 46 F.4th 331, 337-38 (5th Cir. 2022) (holding good faith exception applied to three-page warrant to search the arrestee's cell phones where the warrant "detail[ed] the facts surrounding Morton's arrest and the discovery of drugs," including the location and volume of the drugs, the affiant attested that in his experience "cellphones are used for receipt and delivery of illegal narcotics," and that "criminals often take photographs of co-conspirators as well as illicit drugs and currency derived the sale of illicit drugs," and the affiant alleged multiple cell phones were recovered).

In the circumstances of this case, it is untenable to conclude that a reasonable officer could not rely on the magistrate judge's issuance of the warrant. Putting aside the clear showing of probable cause, the good faith rule precludes the exclusion of evidence in this case.

# CONCLUSION

For the reasons stated above, the government respectfully requests that the order of the district court suppressing evidence be reversed.

Respectfully submitted,

DAVID METCALF
United States Attorney


*/s Robert A. Zauzmer*
ROBERT A. ZAUZMER
Assistant United States Attorney
Chief of Appeals
Pa. Bar No. 58126


*/s Ashley N. Martin*
ASHLEY N. MARTIN
Pa. Bar No. 314636


*/s Nicholas A. DiMarco*
NICHOLAS A. DiMARCO
Pa. Bar No. 332632
Assistant United States Attorneys


United States Attorney's Office
615 Chestnut Street, Suite 1250
Philadelphia, PA  19106
(215) 861-8568

# CERTIFICATION

1. The undersigned certifies that this brief contains 12,939 words, exclusive of the table of contents, table of authorities, signature block, and certifications, and therefore complies with the limitation on length of a brief stated in Federal Rule of Appellate Procedure 32(a)(7)(B).

2. I hereby certify that the electronic version of this brief filed with the Court was automatically scanned by OfficeScan Real-Time Scan Monitor, version 10.5, by Trend Micro, and found to contain no known viruses. I further certify that the text in the electronic copy of the brief is identical to the text in the paper copies of the brief filed with the Court.

/s Nicholas A. DiMarco
NICHOLAS A. DiMARCO
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that this brief has been served on the Filing User

identified below through the Electronic Case Filing (ECF) system:


        Abigail E. Horn, Esq.
        Jeremy Isard, Esq.
        Assistant Federal Defenders


                      */s Nicholas A. DiMarco*
                      NICHOLAS A. DiMARCO
                      Assistant United States Attorney


DATED: June 18, 2026.